All right, Mr. Johnson, you're going to go first. Mr. Allen, we're here to support the council. We've divided up the time 15 minutes for each of the appellants. I'd ask if you can warn me with three minutes left. Keep an eye on the clock and I'll do my best to help you if I don't get to see a clock. Oh, there we go. Okay, that'll do it. You're oriented now? I am. Okay, you bet. Basically, I think you always hear the idea of the facts are on your side, you argue the facts, the law is on your side, you argue the law. Well, I want to start off on the facts in this case and how slim the government's case was. Government Exhibit 1A, it's under tab number two in my excerpts of record, is the sum and substance of the telephone call in this case. It's about a page and a fifth. Nothing in this telephone call clearly points out that the call involved drugs or any nefarious activity. That is the extent of my client's involvement in the case. As far as evidence, that substantive evidence that's shown in any tape recordings, there's absolutely no other phone calls, wiretaps, or any other evidence to show that she was involved in this alleged drug conspiracy. So clearly, when you look at and analyzing the evidentiary issues... Wasn't there testimony that the CI had a meeting with her as well? Wasn't there a face-to-face meeting? I'm going to get to that. Obviously, the CI or Mr. Alfaro testified to all kinds of things. Okay, but when you said that there's the only evidence in the case, that's not really correct, technically, is it? What I should have said is, other than the testimony of Mr. Alfaro, that's what I meant to say, and I apologize for that. For all the reasons you've argued in your brief, it's not worthy of belief. Well, not worthy of belief, but was bolstered improperly, in my opinion, by the government. Basically, and again, my main point is that because of the lack of other evidence other than Mr. Alfaro, that's why these evidentiary issues are so important. I've lined them out in my brief. There's the two issues. The one issue is the, was it hearsay, inadmissible hearsay? Did it violate the confrontation clause when he was allowed to testify about what this woman named Margarita, who purported to be a friend of my client, is accusing her of being a drug runner to Chicago? Well, the government says, and the judge ruled that that was just background information. Well, you could say background information about any kind of statements could be said to be background information. The problem is, you could drive a truck through that kind of an exception. And I think the law- But the district court did give a limiting instruction, did it not? I don't believe they did, no. Was one requested? No limiting instruction was requested. There was objections up to a point, and then the lawyer didn't object to an additional statement made by Mr. Alfaro. And isn't it incumbent upon counsel to ask for a limiting instruction? Well, I think it is, but again, that's part of my additional argument about whether there's ineffective assistance. And so I- So the question is whether or not there's a waiver on that objection as a result of the failure to request the curative instruction. Well, I think that's one argument the government will probably make. But then again, it's an issue of, in my view, an issue of constitutional violation. And so I think we can argue it in any event. It's a violation of the Confrontation Clause because, here's why, that statement, it's not- It could have been said background information would have been, I heard from this woman, Margarita, she told me to talk to Letitia. But when you went that next step- We do permit, Mr. Johnson, do we not? At least the government at the start of its case to tell the jury a little bit about why we started with Ms. Dominguez in this case. We didn't just pick her out of the phone book and say, you know, let's see if she'll sell us some dough. Well, there's a way to do it without saying what this other person made these bald-faced accusations that she's running drugs to Chicago. You just say, make it along the terms of this woman told me about this friend of hers, and I talked to her, and leave it at that. Then you don't have this hearsay coming in. Government's going to say, well, it's not hearsay because it's background information, but the case law I cited is- So you're not disagreeing with the proposition that the government can set the stage. What you are disagreeing with is the manner in which they did. That's exactly right. And there's got to be a line drawn somewhere, because otherwise, why can't you just say any hearsay statements that explain the background are admissible? They're not, because the Thomas v. Hubbard case talks about that, and I cited that in my brief, that there's a point. And I think the line was crossed here, because how much more prejudicial statement can you have than this person who's supposedly a friend of my client accusing her of being a drug runner? My client has no way to confront that. You've got this Guerrero claiming that she made this statement. To me, and as I argued in my brief, it's beyond the line. It violates a confrontation clause, and it was improper, and it should not have been allowed. It does- it's clearly relevant. The question is whether or not it's overly prejudicial, because he contacted her with the intention of trying to use her assistance in getting to the person for whom, in your theory of the case, she was running drugs for in order to get access to the drugs, right? According to his testimony- Well, we have to assume in light of the jury's verdict that the jury believed that there was a narcotics conspiracy going on. Well, I think there was a narcotics conspiracy of the other defendants. The question is, was there enough based on this little short phone call, which is very innocuous, when you get to- obviously, the whole case for the government rises or falls pretty much on Mr. Alfaro, whether you believe him or not. Which then brings us to the next error that I've talked about, is the vouching. And you have the- you know, the government's going to say, well, that's in response to an attack on the credibility of the witness. Well, the vouching issue came up in the testimony of Agent Kaiser when he is- the government introduced the exhibit confidential source agreement. That was tab number 10 in the excerpts. It's government exhibit 25. Hadn't counsel opened the door to that, though, with regard to opening statements and- Well, how do you open the door to improper vouching by the government agent? No, no, no, no, no. The question is whether or not, A, defense counsel has raised the issue with regard to the motivation of the informant to testify and whether he's going to color his testimony. And our case law says that when that happens, the government is permitted to introduce some evidence in response as to what his motivation is. But can they introduce the evidence of a DEA agent's opinion that the witness has followed the agreement, the agreement which says, I shall tell the truth? That's vouching. That's vouching kind of by a backdoor technique. But it's vouching because when you look at the- It's pretty subtle in terms of the kinds of vouching protests I've seen. You have to say that's a pretty subtle one. But it's subtle in a case that has so little evidence of my client's guilt. It's so important because of that. When you look at the confidential source agreement, and you look at how the government emphasized that, and then you have the question, which was unobjected to, did he- He followed the agreement, which means he didn't commit perjury. He didn't- A jury, they're not stupid. They're going to look at that, and they're going to say, well, Agent Kaiser- We don't know what they did in the jury room on this case with such limited evidence. And that's why this type of evidence was so prejudicial. And that's why it's plain error. Because it comes to, in this close case with such a lack of evidence on the government's part, being- Having Agent Kaiser- And actually, he even bolstered the witness's credibility before he even took the witness stand. Because this came up in the direct and cross-examination of Agent Kaiser before Alfaro ever took the stand. So you've got this- The government agent saying, putting his stamp of approval on the witness, in his opinion, given that statement that Alfaro followed the plea agreement, or the witness agreement, therefore, he did not lie. I, as government agent, the jury could say, well, Agent Kaiser said he didn't lie. He's dealt with them on other cases. That's exactly what the problem is with vouching. And that's exactly why Alfaro then is cloaked with this improper vouching by the government witness. And government's going to say, ah, harmless error, not plain error. I beg to differ. I think it is plain error. It certainly goes to the heart of the case. Because this case came down to the credibility of Alfaro versus my client's credibility about what that phone call was about. Because of the lack of other evidence. Now, they're going to point out, I'll remind you, there was a testimony by Agent Hanton, where he talked about a conversation that he had with my client in a vehicle on a transportation. You'll probably, maybe, remember that in there. But all that said was, she knew where a person named Miguel Verduzco lived in Mexico. Can this help me out? Not a confession to anything in detail. I don't think it rises to the level of saying that she's confessed to anything. So, you know, you can always want to spend half a day talking about these cases. But then I threw in my additional, you know, I've talked about the lawyer's actions. I know you normally don't do ineffective assistance of counsel on a direct appeal. But sometimes you can. And I put that argument in. The third item I argued was, or fourth item, was the cumulative error violates my client's right to due process of law. If you look at each of the individual errors and you say, yes, we believe they went over the line on the hearsay, it was hearsay, and it violated the Confrontation Clause. But that alone isn't enough to result in a reversal. Or you look at the, yes, we think there was vouching. We think it's plain error. But we don't think that's enough. But when you add them together, with the lack of evidence, and just, again, look at the telephone call, and the lack of any other evidence, in light of that, these trial errors became very important, resulted in an unfair trial. And I'll be asking you to reverse it and give her a new trial. Very well. Thank you very much, Mr. Johnson. Ms. Bolton, do you want to respond now? Or do you want to wait until Ms. D'Angelo? I'm happy to wait. Why don't you do that? And then we'll just have you address both at the same time. Okay. Ms. D'Angelo? Thank you, Your Honor. I represent Mr. Chacobo on cause number 0530193. Your Honor, the principal issue that I intend to address is whether there was sufficient evidence to convict Mr. Chacobo of conspiracy and distribution of methamphetamine. Mr. Chacobo allegedly joined this conspiracy during an August 14th phone call between the confidential informant, Mr. Alfaro and Verduzco. Mr. Verduzco handed the phone to a person identified only as Vaquiton. And Vaquiton directed Mr. Alfaro to go see an old man at a 6th Street house. There was another incident on August 18th when Vaquiton is on the phone again, telling Mr. Alfaro where to take the cards. The sole evidence that my client was Vaquiton was the testimony of Guillermo Alfaro. There was no physical or circumstantial evidence linking Mr. Chacobo to the voice on the telephone. He was not identified as the person as Vaquiton until a month later from his driver's license photo. And Special Agent Kaiser testified that they could not identify him prior to this as they didn't know his name. Didn't the jury hear evidence that Alfaro knew your client from some prior hanging around the auto repair shop or something? Yes, Your Honor, but we submit that that was to attenuate to state a reasonable basis for this voice identification. He knew him in 2000. Alfaro testified that he owned a garage or a repair shop in 2000 and 2001, that he owned it for a period of nine months. A lot of people hung around that shop, and Mr. Chacobo hung around at that shop. He closed the shop in 2001 and lost contact with him. So there's at least a two-year period where he hadn't heard his voice on the phone, where he hadn't talked to him, where there was no contact. And I was stating as if a colleague had called you out of the blue and just said, Well, I guess it would depend on how frequently they communicated with one another during that nine-month period. Was there testimony to that effect? Well, he testified that he lost contact with him. Well, that's not my question. My question is, what did he tell the jury about how frequent his contact was with Mr. Chacobo during that nine-month period? Oh, he testified that he hung around the shop every other day, daily, kind of. So they had a lot of conversations then. So then the question is, could he remember what his voice sounded like three, four years later, right? When did this conspiracy occur? What year? The conspiracy occurred in 2003. Three. So we're only talking about a period of about two, maybe three years max. And the question is whether or not the jury could conclude from that evidence that he had sufficient enough familiarity with his voice to identify him as one and the same in a telephone conversation that much later. Yes. And the cases that we cited in our briefs— And why isn't that a jury—that's a classic job for the jury. As a matter of law, we can't declare that that's insufficient for the jury to make the determination that he had a foundation to identify the voice, can we? Your Honor, that's the—we're here today on a manifested justice standard. We're talking about sufficiency of the evidence right now. And the question is, did the jury have sufficient evidence in order to identify your client's voice on a telephone conversation two to three years later when he had had conversations with him every other day for a period of nine months in 2000 and 2001? That's my question. No, given the other conflicting testimony about who this person was. Mr. Alfaro— No, that's not enough? No, it's not enough. Okay. And what case would you cite to me for the proposition as a matter of law that we should declare that to be inadequate so that no reasonable jury could conclude from that much contact that he could identify Vacaton's voice as being Jacobo? Well, Your Honor, there was other evidence as well. The Vacaton could have been—was different people. It wasn't Mr. Jacobo. But that would all be for the jury to sort out as to how many people were known by the I mean, Mr. Alfaro says, this is the fellow that I was speaking to, identifies him later on from his driver's license. Yep, that's the guy that I was talking to. That's the same guy who was across the street from me for nine months in 2001. I knew exactly who I was talking to. Now, you can argue to the jury that they don't have to believe him, that Mr. Alfaro has got bad memory or that he's a liar or that he's just—that he's well-intentioned, but he's mistaken. You can argue that he's old. You can argue a lot of things. But can you argue that that is, as a matter of law, insufficient evidence? I think that was Judge Tallman's question. Well, Your Honor, there is a case cited in our brief that says that the uncorroborated evidence of a co-conspirator, in this case, not exactly on point because he wasn't a co-conspirator but a government agent, would be enough if—unless it's patently—his testimony is patently incredible. And that's the second prong of our arguments, that this testimony was patently incredible. Because Mr. Alfaro stated—testified that he did not think that Mr. Jacobo, even though—even with his prior acquaintance, was a drug dealer. And he didn't know he would be— Well, there's good reasons why we would—why we might want to have a corroboration rule for, in the case of a co-conspirator who would have every incentive to want to finger somebody else in the conspiracy. Mr. Alfaro is not a co-conspirator. We don't have any particular motive for Mr. Alfaro to lie here, do we? Well, sure we do. He was paid for the more people he brought into the conspiracy, and that was established at trial. Well, if that's the case, then he should have fingered a whole bunch more people. Given this one-time drug transaction, he was able to—he is fingering a lot of people, people that weren't seen, people that weren't—that weren't involved in this. But you don't dispute that he was talking to somebody on the phone? No. The question is whether he was talking to your guy. Yes. And we're submitting that it's—that that was—that there wasn't enough evidence for that to go to the jury. There are voice identification cases that are cited in our brief, but in each case there was sufficient, but I offer them in terms of comparison. In United States v. Turner, there was a voice identification, but the informant had known the defendant for 20 years and had talked on the phone with him numerous times. That clearly would be sufficient. Is that the minimum that's required? And otherwise, if you have less than 20 years, then we don't let voice identification come in? Clearly, that would— What rule are you asking us to adopt, your counsel? Are you asking us to adopt a rule that if you talk to somebody every other day for a period of nine months, and two years later you talk to them on the phone, that that is not sufficient as a matter of law, and that's a rule you would like us to adopt? I would like the rule to be that that isn't a reasonable basis to identify—to make a evidence that connects Mr.— So the answer is you really do want us to say, as a matter of law, that's not sufficient. Every other day for nine months, and then two years later, a phone conversation. There is a two-year intervening period— I think your answer has to be yes. I don't understand how you can answer it any other way. Either the evidence is sufficient or it is not, as a matter of law. Given that— Did the jury hear Mr. Jacobo? Did they hear his voice? No, they did not. Not off of anything? No recordings, nothing else? Oh, yes, they did. They heard—no, they did not hear him. They did not hear his voice from any source? They didn't hear him stand in court? Did they hear him address the judge? No, they did not. Okay. They didn't testify? They didn't hear any recordings? No, they didn't. So we don't know, then, what—whether they might—whether the jury could have thought that he had a distinctive voice. No. No, and there was no voice evidence. But you didn't put that into—you didn't controvert that. You didn't suggest that Mr. Jacobo's voice was undistinguished from anybody else's voice. That is, it sounded like every man. That was not controverted at trial. And, Your Honor, we made an effective assistance to counsel. And they didn't—they didn't—the government didn't play any tape recordings of phone conversations with your client's voice? No, the government played the vacuodon tapes. The Capitol Hill— Wait, wait, wait. I'm sorry. I'm sorry. It was—they alleged that—so the jury did hear tapes that the government alleged were Jacobo's? Yes. So they did hear a voice that was alleged to be Jacobo's voice? Yes. From which the jury could have—could have derived—could have decided that this was a voice that was distinctive and therefore easily identified and remembered over the course of two years? Or they could have decided that this was a voice that sounded like everybody's voice and it could have been easily misidentified? But they never heard from Mr. Jacobo. Okay. Now, you told me that you just alleged ineffective assistance to counsel. Are you arguing it was ineffective assistance to counsel, not what Mr. Jacobo on the stand thought the jury could hear his voice? Your Honor, I don't think that particular issue can be reviewed here because that might have been a strategy. Because we don't know why he didn't call it? Yes. Okay. But you're not alleging that it was ineffective assistance of counsel to fail to put Mr. Jacobo on the stand so that they could hear his voice? No, I'm not. The amount of this evidence should cause us concern when there is no circumstantial or corroborating evidence offered otherwise. No fingerprint evidence. No telephone records, even though they're on the phone. No voice exemplars. And the government presented no evidence that he was seen prior to or during the drug buy. And the government presented no fingerprint evidence linking him to the methamphetamine recovered from the sale. The only other evidence was the voice. Other than Mr. Alfaro's voice, identification was highly prejudicial and irrelevant. And Grace, in our brief, Agent Kaiser's repeated references to Mr. Jacobo as a fugitive five, six times, stating that he was a fugitive, even though that wasn't an issue in this case. And that had happened after the events here. Well, I saw that argument in your brief. And I'll obviously hear from Ms. Bolton on this. Was it the government's theory that the home invasion and the murder was committed as an overt act in furtherance of the conspiracy or not? Or was it completely unrelated? I believe it was completely unrelated. I don't see anything in the record that indicated that. So was there a conspiracy? There was a conspiracy charge here, wasn't there? There was a conspiracy charge. What was the period of time covered by the drug conspiracy? The period of time covered by the drug conspiracy was... Well, let me just ask the question a different way. Did the home invasion occur within the period of time charged in the drug conspiracy? No, Your Honor, I believe not. The co-conspirators alleged were the people involved in this trial. So they didn't try to prove up the home invasion as an overt act in furtherance of this drug conspiracy? No, no, they did not. Not raised in our brief, but raised in Mr. Johnson's brief and equally applicable here is the vouching issue. I apologize for not raising it in our brief. And we intend to bring a motion to amend our briefing to incorporate that by reference. Should not prejudice the government as it's the same issue. And should cause the court the same concern that when the only evidence... So you want us to grant you an exception to the waiver rule? Yes, Your Honor. All right, duly noted. And the other evidence was Agent Kaiser testified that Mr. Alfaro identified Mr. Jacobo at or near the time of the August 14th phone call. But his later testimony showed that he didn't identify him until a month later. So even though they're such good friends, they've known each other... Well, but the identification was they found that Agent finally got a driver's license photo, right? And then they showed the photo and said, do you know this guy? And he said, that's Vacaton. Because no one had seen him and they didn't know his last name. But you're not challenging Mr. Alfaro's ability to identify a picture of the guy that he saw every other day for nine months. No, but I'm saying is that Agent Kaiser testified that he identified him at or near the time of the telephone call. Okay, but it was actually a month later. But it was actually a month later. I'm not sure if it's okay, so... Which again, bolstered the credibility of the... Improper identification. Okay, got it. Thank you. Thank you. Okay, Ms. Bolton. May it please the court, your honors, I'm Jill Bolton with the US Attorney's Office in Spokane, Washington, the Eastern District of Washington. And I was a trial attorney, so I'm familiar with the facts. If there's any questions you have, I'm certainly going to try to answer them. I'd like to go first to respond to the first argument. And I'm going to just do it in the same order that it was presented. The first issue that was brought up by the defendant in Dominguez-Villa case was the question of hearsay statements. And the issue of the witness taking the stand and providing an explanation for the jury as to why the government initiated investigation involved this woman that was later on a recorded phone call in this conspiracy. The government should not be constrained to present its case in a vacuum, to try to explain to a jury that we just randomly selected this woman and gave her a phone call. That would create a very difficult position for the government to explain its course of action in a conspiracy investigation. Counsel, what evidence do you have that ties Dominguez to this? I'm looking at Exhibit 2, which was mentioned by Mr. Johnson. Yeah, it's a fairly cryptic transcript, isn't it? It is. But I think he also testified at length about how – well, he began explaining, and that again gave context to this investigation, that he had met this woman through a friend. And as a result, as a result of that – He being Mr. Alfaro. Excuse me, yes. He being the confidential source, Mr. Alfaro. And through this meeting, he had learned some information, which he described to the jury very specifically as some information that she was running drugs from Chicago. He then explained about a specific personal face-to-face meeting he had with this woman and the discussions that they had, the specific discussions they had about her ability to give him cocaine and to connect him with someone who could provide him with cocaine. And as he explained in his testimony, she was someone who was kind of like the bridge. She would make the connection to the dealer. And indeed, the evidence played out exactly like that. It was small. It was not a huge amount of evidence involving Ms. Leticia Dominguez Villa, but it was information that explained this connection. The phone call was played to the jury in Spanish, which was the language it was spoken in, and then a transcript of that was read to the jury so that they could follow what exactly transpired. And what's very significant, I think, and what the jury probably relied on, and we defer to them, is that within a very short time period after that phone call ended, after the discussion about, I'm going to have my man call you, and very vague discussions with no specific reference to drugs, which is typical of a drug transaction on the phone or drug dealings on the phone, very short time later, the confidential source, Alfaro, gets a phone call from Verduzco. And then we have a whole host of evidence implicating Verduzco, the meeting at El Mirador restaurant in Yakima, and all of the discussions about drug deals that followed. And an individual in a conspiracy can be made a part of that conspiracy, however slight the connection. And that's what it was. In answer to Judge Bivey's question, you would say that the evidence against Dominguez was corroborated by the fact that the sequence of events, that after the phone call and the face-to-face meeting, lo and behold, somebody calls and says, I hear you're in the market, and then they meet and a drug deal is negotiated. Yes, and what's significant is she would not give him the telephone number to call him. She said, I will have my man call you, and then he calls. That was the connection. It was a slight connection to the conspiracy. It was enough under law to make her a co-conspirator. And that's really the reason for the law, is to prevent that kind of aiding of criminal actions that occurred in this case. On the second issue, the vouching of the confidential source by Agent Kaiser. The question, and basically what the vouching is that's alleged here, is that somehow the as far as I knew. But I think vouching goes to the testimony that's provided at trial, doesn't it? And if that's true, how could Kaiser vouch for testimony that hadn't even taken place yet? Well, you can vouch for a witness, can't you? You can come in and say, I've known this guy. I've been working with this guy for a long time. I'll tell you, he's a really honest, really straightforward guy, and everything he's going to tell you is going to be the truth. Now, that would anticipate, be an anticipatory vouching, wouldn't it? I think so, and I think It would still be vouching, whether it was anticipatory or not. You could have also said, he's going to testify, and he's going to tell you the truth. But that's not what happened. What happened was there was an attack through Agent Kaiser's testimony on the incentive of this confidential source, the money incentive, which was attack on the credibility. He's here just for the money. He's not here because he's, you know, he's here to implicate someone in a conspiracy because it actually happened. He's just doing it for the money, which is an attack on credibility. And once this issue of the confidential agreement was raised and questioned and this kind of Was the agreement itself put into evidence? Does the jury have access to the agreement itself? It was admitted and read into the record so that the jury had a clear understanding of exactly what the agreement was, because it was attacked, and the door was opened on cross-examination of Kaiser. Assuming we agree with your characterization that the door was open, the case law says the agreement comes in, right? I believe so. How else can we respond to an attack on agreement if it's about evidence? If the terms of the agreement are not known to the jury. Right. So then the objectionable portion then would be the agent saying, I never had any reason to believe that Alfaro had done anything in breach of that agreement. Right. That's, if it's vouching, that's what it is. That's what's being alleged, right? We think that that's not vouching for his trial testimony. That's explaining the attack that was made on this guy's credibility. As Bybee points out, it's a little subtle, but it's a little more than that, Ms. Bolton, isn't it? I mean, in the agreement is the clause that basically says you will testify truthfully and completely at all hearings and trials that the government calls you at, and any grand jury proceedings. And if we think you're lying, the wrath of God will descend upon you. And at the time that Agent Kaiser testified, the informant hadn't. But that clause is all in the agreement, right? The jury could read it and say, oh, this guy also has an obligation to tell the truth. Well, yeah. So when the agent says, I never had any reason to believe that he was in breach of the agreement, what he's really saying is, I don't think he ever lied to us either. Well, what he didn't say is, I don't believe he's lied before you, which I think is very crucial, because he hadn't yet testified. And also, I think we have to give credit to the jury as a fact finder to decide for themselves. And they were instructed by an additional instruction during Instruction 19 about what way to give confidential informants and the considerations. So I think that there was nothing overly prejudicial about this. The agent could have been asked something like this that might have opened the door. If Defense Counsel had said, Agent so and so, did you ever have reason to believe that Mr. Alfaro lied to you, or that he misled you in anything? Now, that certainly would open the door to somebody saying, no, in all of my contact with Mr. Alfaro, I never had any reason to believe that Mr. Alfaro was lying to me. That's a little different from saying, yeah, he's followed the agreement. I think it is different. OK. How did they open the door? Oh, well, they opened the door, they attacked the agreement. So how do you explain what the agreement is without introducing the agreement? And the agreement in sort of the generic sense of saying, this guy's got an incentive to lie because he's got an agreement with the government and he's going to get money for his testimony. Right, right. And they attacked his credibility, I think, directly when they said, he's doing this for the money, which was essentially what they were doing. Can you point us to the pages of the excerpt of the record where you assert that the attack occurred in the cross-examination of Agent Kaiser? It's kind of funny, Your Honor, if I could just have a moment. That's right. By the way, you have more time than what's shown on the clock. Thank you. The language specifically in the record, I'm sorry, I'm not finding the specific site of the record, is the question that there was a built-in incentive. I did quote it in my statement of facts, I'm quite sure. That's right, I don't want to, I mean, the portion I was looking at was the redirect, which is excerpt of the record, I guess it's 54. It's page 202 of the transcript, but that's where you actually introduced the agreement. That's right. So it must have been earlier than that. But yes, the attack was during the direct examination. During the cross-examination, right? The cross-examination. Well, I've got, I'm at SDR 120, page 186 of the transcript, which appears to be a cross of Mr. Kaiser asking questions, for example, does he get paid more when a person is arrested? And then asking on the next couple of pages, how much he got paid by the government? This is SDR 120, not... 120, 121. There's an answer here, we do a cooperation agreement, are you familiar with that contract? They're supposed to be truthful to you, and in fact, did the informant sign a contract? Yes. Asking whether there's a built-in incentive to get more people and more drugs. Right. Right, that was in response, again, directly to the cross-examination. This is... I'm sorry, so your question is whether or not that's sufficiently opened the door for us to introduce the agreement. Is that what you're relying on, is really what I was asking? Yes. But I don't want to get hung up. We can read the transcript. We're relying on, yes, the cross-examination, which the credibility is attacked because the cross-examination basically goes into the issue of how much he's paid, and there's an incentive to do this for pay, and you'll get as many... This guy will get as many as he needs just so he can get paid, which is, as far as we're concerned, it's a direct attack on his credibility. He was doing this for the money, not... Not because they were really engaged in drug dealing. Right. Right, I don't know of any other purpose it would have, but to point out the money issue other than to attack his credibility. Okay. As far as the ineffective assistance claim goes, there are several things that weren't fully explored. Why was no objection made to these issues? And I think it's important, too, to keep in mind that as the jury decided the evidence, and this kind of goes back, again, to sufficiency of the evidence, which was raised by the defendant for the first time, as I can tell here today, because it wasn't really specifically in this that part of his argument. But the defendant actually testified. Ms. Dominguez testified at trial. And so the jury could decide who to believe, the confidential source or the defendant, and they didn't believe her. That's within their province to decide, and that's how they decided. Many... I'm sorry, her story was basically that I was offering to help him get auto parts, was that it? Yes. Okay. And really had no explanation as to why the terminology she used was so vague if she was talking about carburetors or parts of a car. On the United States v. Jacobo, again, there's a sufficiency of the evidence claim. The government agrees with the line of questioning that it was at least posed by the court to counsel, and that is... There is no rule, there is no rule of law, nor should there be a legal requirement that there be cooperation. There is the legal requirement that a jury find facts and decide credibility, and the jury did that in this case. What... There's many cases that I can think of that there may be only one witness to a crime. And if we start with rules that there needs to be two witnesses, such as the old perjury statute... Well, we still have it for treason, but that's the only one I can think of off the top of my head. It becomes somewhat absurd as to many of the crimes we try to establish. We have the jury system for a reason. It requires 12 independent minds to decide on someone's guilt, and in doing that, they have to evaluate the credibility. They did that in this case, and they believed Mr. Alfaro. And that is certainly not a basis to reverse their judgment. On the ineffective assistance of counsel claim, again, the record was... What it was, the defense attorneys made their decisions, and it's unclear from the record as it stands presently, because we haven't had a habeas corpus proceeding, as to what their reasons were for not objecting. One of the specific issues raised is the failure to move for Rule 29, motion for judgment of acquittal. Again, that goes to the issue of who is the trier of fact. The judge would be left with the decision of, do I believe the confidential source in deciding that Rule 29 motion? And that's not... And that is, having heard the government's case in chief, he could rule as a matter of law that no reasonable fact finder could identify this defendant from that amount of information. But we don't know what his ruling would have been, because no MJOA motion was made. True, but shouldn't that decision as to the credibility be left with the jury? Isn't that really the province of the jury to decide among themselves? And what other basis would there be? Was there some legal error? Was there an element for which no proof was provided? That hasn't been alleged here. All that's been alleged is that the confidential source wasn't believable. And that was for the jury to decide, and they've decided that. So there was no prejudice, and there really is no clear record as to the basis for an ineffective assistance of counsel claim here. And the final issue that was argued by Mr. Jacobo was the mandatory minimums that was just to preserve the objection for the record as that seems to be settled law. And that's all I have, unless there are any questions. All right, I think not. Thank you, Ms. Volkman. Thank you. Okay, Mr. Johnson. Mr. Chairman, I have a couple of minutes. I'll be real brief. Two points. Counsel talked about, you know, we have a right to tell the jury where our case is coming from. Well, you know how you do that? You go out, you send your agents out, you talk to Margarita, and you subpoena her, and you bring her in and have her tell the jury the story. There's no indication Margarita wasn't available. Well, there's no question that trials always look better in hindsight, and you can always think of brilliant things that you should have done after the results are in. The question is whether or not your client got a fair trial and whether there was enough evidence to convict. I agree with you there, but a fair trial. And when she's looking at 57 months in federal prison, she should be given a fair trial, as I know you absolutely agree with that statement. But to say that somehow this Margarita wasn't available, that's not true. The second thing is, and it's on page 39 of my brief, when she was kind of making this, well, it's okay to generically vouch. It's not a generic, it wasn't a generic vouching. It is specifically a quote from the transcript, and it's ER 5152, tab 10, page 39 of my brief. This is paraphrasing Judge, or Agent Kaiser's testimony. Okay, and in the course of an investigation, if a confidential source who has entered into an agreement such as this with your agency violates any of the provisions of this contract, what do you do? Answer, usually we deactivate them. We don't use them anymore. Question, and during the course of this investigation, did you have any reason to believe that the confidential source in this case, Guillermo, violated any of the terms of this agreement? No. Clearly there's vouching here, and I think the next question becomes, what do we do about that? And again, the question, well, let's back it up, though. The question is, did the cross-examination of Agent Kaiser sufficiently raise in the mind of the jury that they should disbelieve Alfaro, who they had not yet heard from, because it was suggested by innuendo in the cross-examination of Agent Kaiser that Alfaro was motivated by greed and that the more people he brought to DEA, the more money he was going to be paid? Now, why isn't that enough to at least open the door to what the terms of the agreement were between DEA and Mr. Alfaro? The terms of the agreement may be okay. There's some case law that talks about the terms of plea agreements. The government crossed the line, though, when they solicited the specific testimony of the But the defense is suggesting what? That he didn't abide by the agreement. In essence, what he did was, rather than bring legitimate drug dealers in to the DEA, he just went up and rounded up as many of his Hispanic friends as he could so that he could maximize pieces of silver that he was going to get from the government for doing it. And the government argues he's telling the truth, and here's why, and this and that. The problem becomes when the government agent and his authority is used to bolster that credibility. That's where they went too far, in my opinion, and that's where they violated the rule. Why isn't he in a relationship, from the government's point of view, of supervising the effectiveness of the contract? You don't have everything in a contract. How it performs out, post the signing, is still open, isn't it, in the mind of the jury? Isn't the question fair, though, from that perspective? I think it's fair to point out that he has a contract, but I don't think it's fair to have Agent Kaiser say that he lived up to the agreement. Has the performance become an issue? Well, I guess one could say that. The defendant makes performance an issue, doesn't he? The defendant. Well, I don't think the defendant asked the agent did he live up to the agreement or opened the door to anything about the agreement. They were just asking was he paid, and how much was he paid, and then you argue he's got an incentive. Right, but that's performance, isn't it? How much was he paid? That's just not on the face of the agreement. Well, doesn't that open up the other issue? I don't agree at all. I think it may open it up for the agreement being brought in to say, here's what our agreement is, but not when the agent does the vouching. I think we understand the position on this. Thank you, Mr. Johnson. Ms. D'Angelo? Thank you, Your Honor. I don't have very much time left. I would like to address a couple of... Go right ahead. You're the last case on the calendar, and we're patient. Ms. Fulton states that there's many situations where there's only one witness to a crime. There's a witness to a crime. This wasn't an eyewitness at all. And in those situations, there would normally be an eyewitness, and this is different because of the identification simply of a voice. No one ever saw Mr. Jacopo in and around this. As to the ineffectiveness... So he's Kaiser Sosa? Is that who he is? Perhaps. As far as the ineffective assistance of counsel, some of these omissions are reviewable at direct appeal because there can be no... I can think of no strategy reason not to make a Rule 29 motion when your whole case is that there isn't sufficient evidence to convict your client, or to fail to ask for an identity instruction when you're saying this isn't the guy. And as far as the Bright Line Rule that we discussed earlier, there's a case I did in our brief, United States v. Doe, which is a Fifth Circuit case, and it's got very similar facts in that this was a controlled by, set up by law enforcement, and they weren't able to see the person's face because it was dark out, and there was some conflicting testimony as to whether he had a beard, whether he had a sweatshirt. And in that case, they said there was insufficient evidence to convict because there was nobody that actually saw this person here, or there was conflicting evidence as to who saw this person here. So I think that you can say this wasn't sufficient without going into a Bright Line Rule if there is a certain amount of contact. Well, clearly, there must be some point where we could say no reasonable trier of fact could have made an identification conclusion based on the evidence that was adduced. The question here is whether these facts are weak enough where we can make that declaration. And we would admit to the fact... You're saying yes. Yes. Yes. Given that, and given the conflicting testimony of that Vaquitone is not a drug dealer, Vaquitone is a drug dealer, Vaquitone was a drug dealer on July 11th, but wasn't until October 14th. When you look at all of that in total, and you can say it's insufficient, and when you look at that in conjunction with the bad evidence, that was also Agent Kaiser calling him a fugitive, Agent Kaiser vouching for the witness, and stating that there was a contemporaneous ID when there was not, that can... That rises the level of manifested justice. Okay. Thank you very much. Ms. Wolfe? This is Jerry. I'm just about to come up again. I know I don't have any more time. If you want to give us a citation. I just wanted to cite to you the record because I've found it. Supplemental excerpts of Record 121, where we allege that they opened the door to this issue of truthfulness on a cross-examination by Mr. Cotterell of Agent Kaiser at line 17 through the end. He asked about the cooperation agreement. The agent says, I don't have it memorized, but I'm familiar with it. The defense attorney says, okay, and as part of it, they're supposed to be truthful to you. Okay. So that was the portion that Judge Bybee was referring to. That's the part of the record. Thank you. All right. Well, I want to thank all counsel. The case just argued is submitted. I appreciated your arguments. I know I speak on behalf of the panel. And with that, we'll get you a decision as soon as we can. And we'll be adjourned.
judges: Beezer,tallman, Bybee